IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Anna C., individually and | : | |
| on behalf of K.C. | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | |
| Colonial School District | : | |
| 230 Flourtown Road | : | |
| Plymouth Meeting, PA 19462-1252 | : | |

## COMPLAINT

### PRELIMINARY STATEMENT

1.      This action is brought under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (IDEA), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* (Section 504), and the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* (ADA).

2.      Plaintiff Anna C. (Parent), individually and on behalf of her child, K.C., prevailed in a special education due process hearing against Colonial School District ("Colonial" or "the District").

3.      A Pennsylvania special education hearing officer awarded Plaintiff Anna C. (Parent) tuition reimbursement for K.C.'s private placement.  A true and correct copy of the hearing officer decision (H.O. Dec.) is attached as Exhibit A.

4.      As a result, Parent prevailed and is entitled to recoup her reasonable attorney's fees and costs.

### JURISDICTION

5.      Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343 and the aforementioned statutory provisions.

6.      Venue in this district is proper under 28 U.S.C. § 1391(b).

## PARTIES

7.      Parent Anna C. is K.C.'s mother.

8.      Parent resides with K.C. within the borders of the Colonial School District.

9.      Defendant Colonial School District (Colonial) is a governmental unit that administers the public schools within the school district.

10.     Colonial is a local educational agency (LEA) within the meaning of the IDEA. Colonial is also a "program or activity" receiving federal financial assistance under Section 504. Colonial is also a "public entity" under the ADA.

## STATUTORY AND REGULATORY BACKGROUND

11.     The IDEA was passed so that "children with disabilities … have access to a free appropriate public education [FAPE]…." 20 U.S.C. § 1400(c)(3).

12.     To provide FAPE, the IDEA requires LEAs to provide individualized education programs (IEPs) to children with qualifying disabilities.  20 U.S.C. § 1412(a)(4).

13.     The IDEA also requires IEPs to be reasonably calculated to provide a student meaningful educational progress. *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000).

14.     If an LEA denies a student FAPE, the IDEA provides parents and children with disabilities certain procedural safeguards, including the right to file a due process complaint, to remedy the FAPE denial. 20 U.S.C. § 1415(b)(7).

15.     Section 504 requires that students with disabilities be provided FAPE. Section 504 also bars federal funding recipients from excluding, denying the benefits to, or otherwise discriminating against otherwise qualified individuals with disabilities.  Failure to provide reasonable accommodations and supplemental services constitutes Section 504 discrimination.

16.    A party establishes a Section 504 violation where (a) she is disabled, as defined by the Act; (b) she is "otherwise qualified" to participate in school activities; (c) the defendant receives federal financial assistance; and (d) the defendant excluded her from participation in, denied her the benefits of, or subjected her to discrimination at the school. 34 C.F.R. Part 104.2-104.4.

17.    When an LEA fails to provide a disabled child with FAPE, it violates Section 504.

18.    The ADA extends the nondiscrimination rules of Section 504 to public entities even if they do not receive federal funds.   42 U.S.C. § 12132.  Title II of the ADA also specifically requires that public schools provide reasonable accommodations to students with disabilities.

19.    If an LEA denies a student FAPE, parents, on behalf of their child, may be entitled to various remedies under the IDEA, Section 504, and the ADA such as tuition reimbursement.  *See Florence Cnty. Sch. Dist. v. Carter ex rel. Carter*, 510 U.S. 7, 12-16, (1993); *Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 373-74 (1985).

20.    A Parent is entitled to tuition reimbursement if: (1) the public school did not provide a FAPE; (2) placement in a private school was proper; and (3) the equities weigh in favor of reimbursement.  *Id*.

21.    Prevailing parents are also entitled to recoup statutory attorney's fees and costs under the IDEA, Section 504, and the ADA.  *See* 20 U.S.C. §§ 1415(i)(3)(B) and (C), 29 U.S.C. §794a, and 42 U.S.C. § 12205.

## STATEMENT OF FACTS

22.    K.C. is currently in 11th grade.

23.    K.C. attends AIM Academy.

24.     AIM Academy is a private school that provides research-based literacy instruction to children with learning disabilities.

25.     K.C. is a "child with a disability" within the meaning of the IDEA, 20 U.S.C. § 1402(3)(A). H.O. Dec. at 3 ¶ 1. K.C. has dyslexia, other language-based learning disabilities, and other qualifying disabilities under the IDEA.

26.     K.C. is also an "individual with a disability" within the meaning of Section 504 and the ADA. *Id*.

27.     K.C. is otherwise qualified to participate in school activities within the meaning of Section 504 and the ADA.

28.     Colonial receives federal funding. *Id*. at 3 ¶ 2.

29.     In January, 2023, Parent asked Colonial for an IEP for K.C. and advised Colonial if it failed to offer K.C. an appropriate IEP, Parent intended to enroll K.C. at AIM at public expense. *Id*. at 7 ¶ 22.

30.     When Colonial failed to timely develop an IEP for K.C., Parent enrolled K.C. at AIM for the 2023-2024 school year. *Id*. at 8 ¶ 26.

31.     Colonial ultimately denied K.C. an IEP that was reasonably calculated to provide K.C. FAPE. *Id*. at 32.

32.     During the 2023-2024 school year, K.C. attended AIM where she thrived. *Id*. at 13 ¶ 50, 82.

33.     In February, 2024, Parent again advised Colonial that she intended to enroll K.C. at AIM. *Id*. at 13 ¶ 51.

34.     Colonial again offered K.C. an IEP that was not reasonably calculated to provide FAPE.

35.     Because Colonial failed to offer K.C. a timely IEP that was reasonably calculated to provide FAPE, Parent enrolled K.C. at AIM for the 2024-2025 school year.

36.     Given Colonial's failure to offer K.C. appropriate IEPs, Parent filed a due process complaint, asking Colonial to reimburse Parent for the costs of AIM for the 2023-2024 and 2024-2025 school years.

37.     After four days of administrative hearings, an administrative hearing officer found that Colonial violated the IDEA, Section 504, and the ADA by failing to offer K.C. FAPE for the 2023-2024 school year and awarded Parent the cost of AIM.  *Id*. at 32, 37.

38.     The hearing officer denied Parent's claim for the 2024-2025 school year, holding that Parent had not explicitly requested FAPE.  *Id*. at 34-35.

39.     In denying Parent's claim for the 2024-2025 school year, the hearing officer committed error for the following reasons:

    a.     Colonial waived this defense by failing to address it in its answer to Parent's due process complaint or at the due process hearing, and even conceded in opening statements that Parent requested an IEP for K.C. for the 2024-2025 school year.

    b.     Colonial had the duty to offer K.C. an IEP for the 2024-2025 school year, especially given that Parent never disenrolled K.C. from Colonial.

    c.     Parent objectively manifested an interest in an IEP for K.C. for the 2024-2025 school year, by offering Colonial AIM's records, signing a release for additional records, actively participating in an IEP meeting, and following up with Colonial with questions about its proffered program for K.C..

d.    Even if Parent did not expressly request an IEP for the 2024-2025 school year, Colonial's actions indicated an understanding that Parent had made an IEP request.

40.    Because Parent is a prevailing, Parent is entitled to recoup her attorney's fees and/or costs under the IDEA, Section 504, and the ADA.  20 U.S.C. §§ 1415(i)(3)(B) and (C); 29 U.S.C. §794a; 42 U.S.C. § 12205.

## CAUSES OF ACTION

### COUNT I:  APPEAL OF THE HEARING OFFICER ORDER PURSUANT TO THE IDEA, SECTION 504, AND THE ADA.

41.    Parent incorporates the above paragraphs as though fully set forth herein at length.

42.    The hearing officer erred by denying Parent's claim and failing to award tuition reimbursement for the 2024-2025 school year.

43.    Parent seeks an order awarding her tuition reimbursement for the 2024-2025 school year.

### COUNT II:  ATTORNEY'S FEES AND COSTS IDEA, SECTION 504, AND THE ADA

44.    Parent incorporates the above paragraphs as though fully set forth herein at length.

45.    As noted above, the hearing officer found that the District failed to provide K.C. FAPE for the 2023-2024 school year and awarded Parent tuition reimbursement. Colonial is also required to pay tuition for the 2024-2025 school year under 20 U.S.C. § 1415(j).

46.    Parent is therefore a prevailing party in this matter.

47.    Parent has a right to recoup her statutory attorney's fees and litigation costs.

**WHEREFORE**, Parent respectfully requests the following: (1) that judgment be entered against Defendant, (2) an order awarding tuition reimbursement to Parent for the 2024-2025 school year, (3) that reasonable attorney's fees and litigation costs be awarded for the underlying administrative matter and in prosecuting this action, and (4) all other relief that this Court may deem appropriate.

Respectfully submitted,

_____

DAVID J. BERNEY, ESQUIRE
Pa. Bar ID No. 67882
LINDSAY BURRILL-VANDELLEN, ESQUIRE
Pa. Bar ID No. 329247
8 Penn Center
1628 JFK Boulevard, Ste. 1000
Philadelphia, PA 19103
djberney@berneylaw.com
laburrillvandellen@berneylaw.com
215-564-1030 (office)
215-751-9739 (fax)
Attorneys for Plaintiff

Dated: November 26, 2024

# Exhibit A

# Pennsylvania Special Education Due Process Hearing Officer

## Final Decision and Order

## ODR No. 29513-23-24

## CLOSED HEARING

### Child's Name:
K.C. [redacted]

### Date of Birth:
[redacted]

### Parent:
Ms. Anna C. [redacted]

### Counsel for Parent:
David J. Berney, Esquire
Lindsay Burrill-VanDellen, Esquire
1628 JFK Boulevard, Suite 1000
Philadelphia, PA  19103

### Local Education Agency:
Colonial School District
230 Flourtown Road
Plymouth Meeting, PA  19462

### Counsel for the LEA:
Kalani Linnell, Esquire
331 East Butler Avenue
New Britain, PA  18901

### Hearing Officer:
Cathy A. Skidmore, Esquire

### Date of Decision:
08/31/2024

# <u>INTRODUCTION AND PROCEDURAL HISTORY</u>

The student, K.C. (Student),[1] is a late teenaged student residing within the boundaries of the Colonial School District (District).  Student has been identified as eligible for special education pursuant to the Individuals with Disabilities Education Act (IDEA)[2] and has a disability entitling Student to protections under Section 504 of the Rehabilitation Act of 1973.[3]  Student currently attends a private school (Private School) at the option of the Parent.

In April of the 2023-24 school year, the Parent filed a Due Process Complaint under the under the IDEA, Section 504, and the Americans with Disabilities Act[4], contending that the District did not propose appropriate programs for Student for the 2023-24 and 2024-25 school years.  The Complaint was amended the following month.  As a remedy, she demanded reimbursement for tuition and related expenses for Private School for those school years.  The District denied the Parents' contentions and averments as well as the relief demanded.  The matter proceeded to a multi-session due process hearing.[5]

---

[1] In the interest of confidentiality and privacy, Student's name, gender, and other potentially identifiable information are not used in the body of this decision.  All personally identifiable information, including details appearing on the cover page of this decision, will be redacted prior to its posting on the website of the Office for Dispute Resolution in compliance with its obligation to make special education hearing officer decisions available to the public pursuant to 20 U.S.C. § 1415(h)(4)(A) and 34 C.F.R. § 300.513(d)(2).

[2] 20 U.S.C. §§ 1400-1482.  The federal regulations implementing the IDEA are codified in 34 C.F.R. §§ 300.1 – 300. 818.  The applicable Pennsylvania regulations are set forth in 22 Pa. Code §§ 14.101 – 14.163 (Chapter 14).

[3] 29 U.S.C. § 794.  The federal regulations implementing Section 504 are codified in 34 C.F.R. §§ 104.1 – 104.61.  The applicable Pennsylvania regulations are set forth in 22 Pa. Code §§ 15.1 – 15.11 (Chapter 15).

[4] 42 U.S.C. §§ 12101-12213.

[5] References to the record throughout this decision will be to the Notes of Testimony (N.T.), Parent Exhibits (P-) followed by the exhibit number, School District Exhibits (S-) followed by the exhibit number, and Hearing Officer Exhibits (HO-) followed by the exhibit number. There was, unfortunately, significant testimony that did nothing more than confirm the

Following review of the record and for all of the reasons set forth below, the claims of the Parent must be granted in part and denied in part.

## ISSUES

1. Whether the District's proposed programs offered for the 2023-24 and/or 2024-25 school years were appropriate for Student;

2. If the program proposed for the 2023-24 and/or 2024-25 school year was not appropriate, is Private School appropriate for Student; and

3. Are there equitable principles that would reduce or deny any award for tuition reimbursement?

## FINDINGS OF FACT

1. Student is a late-teenaged student residing within the boundaries of the District.  Student is eligible for special education under the IDEA and has a disability entitling Student to the protections in Section 504. (Stipulation, N.T. 63-64.)

2. The District is a recipient of federal funding.  (Stipulation, N.T. 65.)

3. The District's high school serves approximately 1500 students. General education class sizes vary but do not exceed twenty-four students; special education classes may have as few as four.  (N.T. 252, 324, 327, 729; P-18 at 3.)

4. Co-taught classes at the District high school have both a regular education and special education teacher, and sometimes a

content of documents that were admitted.  Citations to the record are not exhaustive particularly for duplicative evidence.

paraprofessional.  Learning support classrooms are smaller with no more than fifteen students, a special education teacher, and one or more paraprofessionals.  (N.T. 347-48, 726-27.)

5.  The District uses a block schedule for its high school with periods approximately sixty minutes long.  (N.T. 348-49, 361-62, 703, 710, 860.)

6.  The District's high school has a daily thirty minute period (bonus block) for all students when students can complete homework, participate in activities or clubs, or seek help from a teacher.  Schedule activities for this block may be an ongoing team decision for students eligible for special education.  (N.T. 360-61.)

7.  Student is bright and among Student's strengths are diligence, logic, and resilience.  Conversely, Student has difficulty with reading, word pronunciation, and processing information; Student also exhibits anxiety especially in public places.  Student spends long periods of time completing homework at home.  (N.T. 68-72, 183, 1051-52.)

8.  The Parent did not provide the District with Private School transcripts for Student, which the District needed to determine credits earned. (N.T. 337-38, 340-41.)

## Early Educational History

9.  Student was adopted as an early elementary school-aged child from a foreign country and did not speak or understand the English language. Student was not provided any educational programming prior to the adoption and had been in orphanages in the foreign country since infancy.  Student developed a fear of being left alone after those experiences.  (N.T. 77-79, 89-90; J-1 at 2.)

10.   Student and the Parent resided in a different state at the time of the adoption and as enrolled in second grade in a public school district there.  Student acclimated well, learned the English language, and did well in school until fourth grade when Student demonstrated learning challenges, particularly with reading and complex language social skills.  Student was determined to be eligible for special education in that other state.  (N.T. 78-81; J-1 at 2.)

11.   A neuropsychological evaluation completed in early 2018 by a psychologist consisted of a comprehensive battery of assessments, including cognitive, achievement, language, executive functioning, and social/emotional/behavioral functioning.  Student exhibited a strength in the area of memory for concrete verbal information; and weaknesses in the areas of reading decoding and comprehension skills; written expression skills; mathematics skills; receptive and expressive language; phonological processing; and executive functioning.  Assessment of Student's cognitive functioning (Comprehensive Test of Nonverbal Intelligence, Second Edition (CTONI-2)) reflected an overall low average range score (87). This evaluation resulted in a diagnosis of Specific Learning Disorder with Impairment of Reading and included an explicit recommendation for a full-time, special education private school.  (J-1.)

12.   A second neuropsychological evaluation in the fall of 2019 yielded some disparate results from the prior evaluation.  Student's cognitive functioning (Weschler Intelligence Scale for Children – Fifth Edition (WISC-V)) reflected a nonverbal index score in the average range with some variability among Indices.  Academic functioning (Wechler Individual Achievement Test – Third Edition (WIAT-III)) was consistent for reading but poorer in the area of written expression.  Student continued to demonstrate receptive and expressive language and

phonological processing weaknesses along with some areas of executive functioning.  This evaluation resulted in a diagnoses of Language Disorder, Specific Learning Disorder with Impairment of Reading, and Specific Learning Disorder with Impairment in Written Expression and maintained the placement recommendation for private school.  (J-2.)

13.  Student's last Individualized Education Program (IEP) in the other date, developed in March 2021, recommended programming to address reading, written expression, and mathematics skills; self-advocacy; and speech/language therapy.  (J-3.)

14.  Student attended private schools in the other state until the family moved to Pennsylvania where other family members resided.  At that time, Student was middle school-aged.  (N.T. 82-86.)

## 2021-22 School Year

15.  The Pennsylvania school district to which the family moved completed an Evaluation Report (ER) in September 2021.  That ER noted parental concerns with Student's reading, writing, mathematics, and speech/language skills.  The ER reported on results of cognitive (average range), achievement, and behavior rating scales, identifying Student with specific learning disability in basic reading, reading comprehension, and written expression.  (J-5.)

16.  The other Pennsylvania school district did not develop an Individualized Education Program (IEP) for Student, and the Parent enrolled Student in a private school (Private School).  Financial aid was available at Private School for students who enrolled early in the calendar year for the fall.  (N.T. 90-91; J-7; J-8; J-9.)

17.  In February 2022, the Parent enrolled Student in Private School for the fall of the 2022-23 school year.  The family was provided financial aid

for the 2022-23 school year by Private School after that enrollment.
(N.T. 92-93; P-2.)

18. Assessment by a speech/language therapist by Private School in the
spring of 2022 yielded diagnoses for a Mixed Receptive/Expressive
Language Disorder.  (J-6.)

19. Student and the Parent moved into the District in May 2022.  (N.T.
91.)

20. Private School offered and provided speech/language therapy services
for Student in the spring of 2022, but the Parent later declined further
services at Student's request to avoid missing any other class time.
(N.T. 167-68.)

21. Student finished the 2021-22 school year at Private School having
qualified for honor roll each quarter.  At that time, Student continued
to demonstrate weaknesses with reading and written expression skills.
(J-9.)

## 2022-23 School Year

22. In January 2023, the Parent contacted the District for the first time
and completed registration paperwork for Student.  She asked for a
"IEP and placement ASAP" for the 2023-24 school year and indicated
that if the District could not do so, she would enroll Student at Private
School at District expense.  (N.T. 96-97, 144; J-10; P-3; P-27; P-28;
S-1 at 3-5.)

23. The District sought and obtained the consent of the Parent for an initial
Evaluation of Student for special education eligibility on January 31,
2023.  (J-11; P-4; P-6; S-1 at 34.)

24.   The Parent obtained an extension of time for financial aid at Private
      School because the deadline had been in early February 2023 and was
      extended to March.  (N.T. 107-08; P-20 at 3-6.)

25.   Student would not be eligible for honors classes at Private School or
      receive financial aid if the March 2023 extended enrollment deadline
      were not met.  (N.T. 112-13.)

26.   The Parent signed an enrollment contract at Private School on March
      7, 2023 with a deposit of $4,320 plus the cost of tuition insurance.
      She  was willing to lose the deposit paid with the March 2023
      enrollment contract.  Shortly thereafter Private School granted
      financial aid through a scholarship.  (N.T. 116-17.)

27.   The District's ER was completed at the end of March 2023, and
      supplemented with a speech/language evaluation in early April 2023,
      twelve calendar days later (hereafter April 2023 ER).  (N.T. 588, 641;
      J-12 at 1.)

28.   The April 2023 ER contained input from the Parent.  In addition to
      areas of strength for Student including hard work and motivation, the
      Parent's concerns were with reading, writing, and mathematics skills,
      in addition to self-esteem and social language.  Additionally, the
      Parent described Student's success with a particular multisensory
      reading program.  Previous evaluations were also incorporated.  (J-12
      at 1, 3.)

29.   Input from Student's current teachers was also provided in the April
      2023 ER.  Strengths they identified included reading comprehension,
      certain written expression skills, and mathematics performance, as
      well as classroom performance; relative weaknesses involved higher-
      level thinking and reading skills, writing mechanics, social skills, and
      self-confidence.  (J-12 at 1-1.)

30. The District school psychologist observed Student at Private School for the April 2023 ER in a science class.  Time-on-task data reflected that Student was on-task 96% of the time, and was actively participating and engaged.  (J-12 at 3.)

31. The District school psychologist did not find the previous Pennsylvania school district evaluation to be comprehensive, particularly when considered with the other evaluations of Student.  However, she accepted its previous cognitive score in the average range as valid. (N.T. 614, 617, 619-20; J-12 at 4.)

32. The District school psychologist spoke with the Parent as part of the evaluation.  (N.T.  689.)

33. Assessments administered by the District school psychologist for the April 2023 ER were the Fourth Edition of the WIAT (WIAT-IV) and the Feifer Assessment of Reading.  Student earned well below average-range scores on the latter on subtests for the Phonological and Mixed Indices and below average on the Fluency Index.  Student's WIAT-IV scores were in the low average range on the Mathematics and Written Expression Composites, and in the average range for Reading Comprehension.  (J-12 at 4-6.)

34. Student exhibited self-advocacy and social skills during the assessments.  (N.T. 642-44.)

35. Speech/language assessment for the April 2023 ER was completed after the original version of the document because the District speech/language pathologist experienced difficulty scheduling a time to assess Student at Private School because of the different school calendars.  (N.T. 345, 779, 803-04; P-10 at 3; S-1 at 11.)

36. Speech/language measures from Private School in the spring of 2022 were summarized in the April 2023 ER.  The District speech/language

therapist agreed with the mixed expressive and receptive language disorder.  (J-12 at 9-10.)

37.  On the Clinical Evaluation of Language Fundamentals – Fifth Edition (CELF-5), Student exhibited weak skills in the areas of following directions, formulating and recalling sentences, and semantic relationships.  Index scores for expressive and receptive language and language memory were also areas of deficit.  Student was eligible for speech/language services to address receptive and expressive language skills.  (J-12 at 10-13.)

38.  The District speech/language therapist spoke conversationally with Student at the time of the assessment.  Based on all information available, she did not believe that Student needed further tests.  (N.T. 817-19.)

39.  Assessment of social/emotional functioning (BASC-3) for the April 2023 ER reflected clinically significant concern for the Parent in the area of withdrawal, and at-risk concern with anxiety, adaptability, and functional communication.  The only teacher-endorsed concern was at the at-risk level for withdrawal, anxiety, and adaptability (one teacher for each).  A separate rating scale for anxiety completed by Student revealed overall average functioning but high average range scores in the areas of separation anxiety and harm avoidance  (J-12 at 6-9.)

40.  The April 2023 ER identified Student as eligible for special education on the bases of Specific Learning Disability and Speech/Language Impairment.  A number of Student's strengths including reading comprehension, basic mathematics skills, executive functioning, and class engagement were noted.  Needs were identified in the areas of basic reading, reading fluency, and written expression skills, as well as expressive and receptive language.  (J-12 at 15-16.)

41.  Recommendations to the IEP team in the April 2023 ER included small group instruction for reading and written expression in addition to various strategies and supports for those areas as well as general academic skills and anxiety, post-secondary transition, and home-school communication.  (J-12 at 16-17.)

42.  The District declined the Parent's request to tour the school building during school hours.  (N.T. 120-21, 329.)

43.  The Parent attended IEP meetings in April and June 2023 and asked questions.  The team also reviewed the ER and discussed Student's eligibility for special education.  The second meeting was necessary as a result of additional questions by the Parent and District responses. (N.T. 117, 123-24, 307, 320, 346, 349-50, 372, 374, 596, 696-97, 748-49; J-13; J-16; S-1 at 8-10.)

44.  The April 2023 IEP developed by the District summarized the information in the April 2023 ER, and incorporated Student's strengths and needs.  (J-14.)

45.  A post-secondary transition plan in the April 2023 IEP addressed acquisition of information about post-secondary training with an aim toward full-time employment.  (J-14 at 18-19.)

46.  Annual goals in the April 2023 IEP addressed reading decoding of r-controlled syllables,  vowel digraphs, and diphthong syllables, with a baseline to be determined in the fall; written expression through proficient responses to writing prompts with evidence and explanation judged by content-based rubrics, with a baseline to be determined in the fall; listening comprehension through responses to how/why questions or story retelling, with a baseline from the CELF-5 and a new baseline to be determined in the fall; and understanding and providing different meanings of multiple-meaning words, with a baseline from

the CELF-5 and a new baseline to be determined in the fall.   No goals addressed reading fluency, an identified need, or self-advocacy and self-confidence, reportedly weaknesses for Stuident.  (J-14 at 22-25.)

47.  Program modification and items of specially designed instruction were: explicit instruction and practice in reading instructional texts at Student's level with modeling of appropriate rate, tone, intonation; explicit strategies for decoding and reading fluency including self-monitoring; written supports and strategies (graphic organizers, idea lists/sentence starters, discussions with teacher or peer, editing checklist, and opportunities to revise written assignments after initial feedback); chunking of text with tracking; direct, explicit instruction in a research-based phonics program; preview and pre-reading of textual information; access to audiobooks, speech-to-text technology, and autocorrection; a visual schedule and notice of routine changes; classroom supports (guided notes, prompts and cues for attention, multisensory presentation of directions, encouragement); scheduled time for executive function support during the bonus block; positive reinforcement; test and assignment accommodations (extra time, small group setting, questions read aloud if not testing reading; use of a calculator; rubrics and examples for assignments);  weekly counseling; and access to a quiet setting without distractions as a calming strategy.  (J-14 at 26-27.)

48.  Student's proposed program in the April 2023 IEP was one of supplemental speech/language and learning support; 120 minutes of speech/language therapy/month; and Student participating in regular education except during reading instruction in the learning support classroom with a modified curriculum.  Student's history, science, mathematics, and English/Language Arts classes would be co-taught. (J-14 at 29.)

49.  The multi-sensory phonics program is research-based, addressing
     word study, grammar, and comprehension with both individualized
     instruction and differentiated computer-based components.  (N.T. 861,
     865, 1274-77.)

## 2023-24 School Year

50.  Student attended Private School for the 2023-24 school year.  (N.T.
     125.)

51.  The Parent contacted the District again in February 2024, notifying one
     of its professionals that she intended to enroll Student at Private
     School for the 2024-25 school year at District expense.  She also
     offered to provide Private School records "if [it would] like to see how
     [Student] is doing at school" (P-16 at 6).  The District denied that
     funding, noting its willingness to convene an IEP meeting and asking
     the Parent to share any useful data she wished.  The Parent sent
     Student's most recent report card in response.  (N.T. 126; P-16 at 6-
     8; S-1 at 44-45.)

52.  The Parent obtained another extension of the enrollment deadline for
     Private School through March 2024.  (N.T. 130-31.)

53.  On March 20, 2024, the Parent signed an enrollment contract for
     Student for the 2024-25 school year at Private School, and paid a 10%
     deposit along with tuition insurance.  (P-13; S-7.)

54.  Also on March 20, 2024, at District request, the Parent executed a
     release for Private School records to include all evaluations, report
     card grades, standardized test results, and any special education data.
     (P-14; P-16 at 4-5.)

55.  The Parent attended a videoconference IEP meeting for Student in May
     2024.  Although she did not already have a draft of the document, the

District scrolled through it on-screen and the Parent had few questions or comments as they reviewed the IEP.  (N.T. 131-32, 316-17, 320, 373; J-27.)

56.   The May 2024 IEP summarized input from the current Private School teachers and the assessment information from the previous IEP. Student's areas of need were maintained as well.  A few items were added to the post-secondary transition plan services for independent living skills.  (J-25.)

57.   Annual goals in the May 2024 IEP had a new goal for written expression (use of conventions of standard English including grammar, usage, capitalization, punctuation, and spelling based on writing rubrics, with a baseline to be determined); added a reading fluency goal for improved fluency based on a baseline from Private School; and revised the decoding goal to include VC-e syllables and final consonants with a baseline determined by the Private School multisensory reading program.  The previous goals for listening comprehension and multiple-meaning words were maintained.  (J-25 at 22-26.)

58.   The program modifications and items of specially designed instruction from the prior IEP remained in the May 2024 IEP, with the addition of designated breaks.  The proposed program of speech/language and learning support also were maintained.  (J-25 at 30.)

59.   The Parent sent questions via email to the District Supervisor of Special Education after the May 2024 IEP meeting, and the District responded.  (P-18.)

60.   The District Supervisor of Secondary Special Education observed Student at Private School on the last day of the 2023-24 school year. (N.T. 380-81.)

**Page 14 of 39**

## Private School Evaluation May 2024

61. The Private School conducted an evaluation of Student in May 2024 after several dates of assessments.  This evaluation incorporated information from previous evaluations particularly from 2018.  (P-19.)

62. Parent input into the May 2024 evaluation reflected her view that Student was hard-working and enjoyed school and its challenges; her most significant needs were in reading and writing.  She expected that Student would go on to college after graduation.  ((P-19 at 2.)

63. The Private School evaluator observed Student at Private School and included teacher input into the report.  Student was also interviewed for this evaluation.  (P-19.)

64. Cognitive functioning assessed for the May 2024 Private School evaluation (Woodcock-Jonson Tests of Cognitive Abilities – Fourth Edition (WJ-IV-COG) yielded a General Intellectual Ability score of 88, at the upper end of the low average range; on a Composite of Fluid Reasoning and Comprehension-Knowledge, however, Student's score was in the average range, indicating uneven development of cognitive functioning.  On a separate assessment of memory and learning, Student earned average to very high average range scores. (P-19 at 16-23.)

65. Academic achievement (Woodcock-Johnson Tests of Achievement – Fourth Edition (WJ-IV-ACH) was assessed for the May 2024 Private School Evaluation, and results were consistent with previous testing of reading skills.  Student's areas of weakness were reflected across all Composites:  Broad Reading, Basic Reading, Reading Comprehension, Reading Fluency, and Reading Rate.  In the area of Writing, Student's Cluster score for Broad Written Language was in the low average range, and in the average range for Written Expression.  All of the

Mathematics Cluster scores were in the low average range (Broad Mathematics, Math Calculation, and Math Problem Solving).  A second instrument in reading yielded consistent results.  Student's overall academic skills on the Broad Achievement Cluster (Academic Skills, Academic Fluency, and Academic Applications) were scored in the very low range.  (P-19 and 26-34.)

66.  Assessment of executive functioning skills for the May 2024 Private School Evaluation through rating scales revealed some concerns in functioning:  self-monitoring, shifting, working memory, planning/organizing, and task-monitoring.  Student's own ratings did not suggest any concerns.  (P-19 at 24-26.)

67.  The Private School evaluation in May 2024 also reported on the BASC-3 rating scales.  The Parent's scale endorsed at-risk concern with anxiety, withdrawal, and functional communication.  At least one of the two teachers endorsed clinically significant concerns with anxiety (both teachers) and withdrawal; with at-risk concern for depression. Student's self-reported revealed no concerns.  (P-19 at 34-37.)

68.  The Private School May 2024 evaluation resulted in diagnoses for Specific Learning Disability[6] with impairments in reading, mathematics, and written expression.  (P-19 at 39.)

69.  Programming recommendations in the Private School May 2024 Evaluation included a full-time, special education private school placement with individualized reading remediation using a program such as that used by Private School.  A number of other classroom, testing, and study accommodations and supports were also suggested. (P-19 at 40-43.)

---

[6] These were DSM-5 diagnoses (American Psychiatric Association (2013), Diagnostic and Statistical Manual of Mental Disorders, Fifth Ed.), not disabilities under the IDEA.

**Independent Educational Evaluation**

70.  The Parent retained a private psychologist to also evaluate Student in the spring of 2024.   (N.T. 136, 1047-48; P-23.)

71.  The private psychologist observed Student at Private School in May 2024 in three classes, and issued the independent educational (psychoeducational) evaluation (IEE) in June 2024.  The classroom observations were of a remedial reading class, English/Language Arts, and a science class.  (N.T. 1086-87, 1092.)

72.  The private psychologist also observed at the District high school in a co-taught English class and a reading class, with discussion with District staff afterward in a videoconference.  The IEE summarized those evaluations and the later meeting.  (P-23 at 18-23.)

73.  The June 2024 IEE incorporated significant information from previous evaluations and summarized teacher input from Private School. Summary of an interview with Student and the Parent was also provided.  (P-23.)

74.  Assessment of cognitive functioning for the IEE (CTONI-2) yielded above average- to average-range scores across subtests, and a Full-Scale Composite score in the upper end of the average range.  (P-23 at 25-26, 40.)

75.  Academic achievement for the IEE involved measures of phonological and phonemic awareness and working memory, reading (Gray Oral Reading Test, 5th Edition and select subtests of the FAR), oral language (WJ-IV Tests of Oral Language), auditory processing (Comprehensive Test of Phonological Processing, 2nd Edition and select subtests of the Test of Auditory Processing Skills, 4th Edition), written expression (WIAT-IV Essay Composition subtest), and mathematics Feifer Assessment of Mathematics).  (P-23.)

76.    In summary, the IEE measures reflected deficits in most areas of oral language with the exception of oral comprehension; auditory processing; several areas of phonological memory and rapid symbolic naming; visual perception, orthographic processing, and all areas of oral reading; essay composition; and nearly all mathematics skills assessed.  (P-23 at 26-29, 40-41.)

77.    Social/emotional functioning for the IEE (Multidimensional Anxiety Scale, Second Edition, Self-Report) reflected separation anxiety as very significant and social anxiety as significant.  A sensory profile self-report also found that sensation-seeking is the one area of sensory processing that Student reported as being less likely than peers to seek.  In other words, crowded spaces, large settings, and loud noises were challenging for Student.  (P-23 at 29-30, 41-42.)

78.    The IEE psychologist diagnosed Language Disorder, Specific Learning Disorder with Impairment in Reading, Written Expression, and Mathematics, and an Other Unspecified Anxiety Disorder.  This evaluator also provided IDEA disability classifications of Specific Learning Disability (Listening Comprehension, Basic Reading, Reading Fluency, Mathematical Calculation, Written Expression); and Other Health Impairment related to anxiety.  (P-23 at 34-35.)

79.    The IEE psychologist made a number of recommendations for Student including maintenance of the Private School placement; she also made numerous suggestions including accommodations and interventions for language needs, reading deficits, mathematics deficits, written expression deficits, and social/emotional needs; and home-school accommodations.  (P-23 at 35-39.)

80. The District's proposed IEPs lacked many of the recommended by the IEE in the report disseminated after the May 2024 IEP. (P-23; J-25.)[7]

81. A private speech/language therapist retained by the Parent for this hearing interviewed Student and, following a review of numerous records, discerned a speech/language impairment with two major deficits: organizing and integrating thoughts and conveying them verbally with proper syntax and structure; and word finding. This conclusion was based on her finding weaknesses in one of the five areas of language (phonology, morphology, semantics, syntax and pragmatics) present without a neurological, sensory, intellectual, or emotional disability. (N.T. 1189-94, 1201-02, 1205, 1207, 1216, 1226-28, 1232.)

82. Student finished the 2023-24 school year at Private School having qualified for honor roll each quarter. At that time, Student continued to need support for reading and written expression skills but had reportedly made good progress in all classes and gained important skills in the areas of reading and writing, self-advocacy, and self-confidence. (J-22).

## Private School

83. Private School provides educational services to students in grades one through twelve who have language-based learning differences. Private School is college preparatory and provides services to prepare students to transition to post-secondary education. Students in their last year in the upper school also take a college class, which is their only opportunity to interact with typical peers. (N.T. 425-26, 437-42, 489, 540-41; P-1 at 1-2, 13-14; P-33 at 47.)

---

[7] For reasons discussed more fully below, it is not necessary to list those which were part of the IEPs and those that were not.

84.  Private School, with approximately four hundred total students, had
     small class sizes of approximately eight to twelve students in the
     upper (high) school in core classes and smaller class sizes of
     approximately two to four students for reading classes.  Classes at the
     upper school had approximately one hundred eighty total students.[8]
     (N.T. 427, 436, 523, 566.)

85.  Private School set enrollment deadlines and when one of those was
     missed, the student's risk of acceptance for the next school year,
     financial aid, and option to take honors classes decreased.  (N.T. 483-
     85.)

86.  Private School offered academic classes at the upper school in the
     areas of English/Language Arts, History, Mathematics, Science, foreign
     languages, and electives such as robotics and engineering,
     photography, and theatre design.  Support for executive functioning
     was provided with advisors working with students.  (P-33 at 19-35,
     39-44.)

87.  Private School provided support for reading skills in all content-area
     classes.  (N.T. 433-34.)

88.  Private School employed occupational and speech/language
     pathologists, and had a school counselor available in the upper school
     in addition to a school psychologist.  All of its teachers were certified
     by the Commonwealth.  (N.T. 435., 494-95, 499; P-33 at 45.)

89.  Private School provided test and assignment accommodations, support
     for organization, taking notes, and study skills for all of its students.
     (N.T. 430-31.)

---

[8] The past tense is used to describe the Private School at times because these finds were
made as of the final day of the due process hearing.

90.  Any student at Private School can apply for an honors class and must take an assessment before acceptance.  (N.T. 524-25.)

91.  Student participated in extracurricular activities at Private School. (N.T. 445; J-17; J-22.)

92.  Student has taken honors-level classes at Private School.  (N.T. 444, 482, 526.)

93.  Student has had a reading remediation class at Private School that also addresses spelling and other written expression skills.  (N.T. 479-80.)

94.  Student has been well-organized at Private School, has engaged in self-advocacy, and has been dedicated and conscientious.  (N.T. 444, 448-49.)

95.  Student has exhibited anxiety at Private School under varied circumstances.  (N.T. 452-53, 460-62, 554-55.)

96.  Private School teachers met regularly with a school psychologist on staff to discuss all students and their progress, but regular progress monitoring as in public schools was not conducted.  (N.T. 472-73, 492-93.)

# DISCUSSION AND APPLICABLE LAW

## General Legal Principles

In any legal proceeding, the burden of proof is commonly described as consisting of two elements:  the burden of production and the burden of persuasion.  The burden of persuasion in this type of administrative hearing lies with the party seeking relief.  *Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *L.E. v. Ramsey Board of Education*, 435 F.3d 384, 392 (3d Cir. 2006).  The burden of persuasion in this case thus must rest with the Parent

who filed the Complaint leading to this administrative proceeding. Nevertheless, application of this principle determines which party prevails only in those rare cases where the evidence is evenly balanced or in "equipoise." *Schaffer, supra*, 546 U.S. at 58.

Special education hearing officers, who assume the role of fact-finders, are responsible for making "express, qualitative determinations regarding the relative credibility and persuasiveness of the witnesses," particularly when discounting certain testimony. *Blount ex rel. Blount v. Lancaster-Lebanon Intermediate Unit*, 2003 WL 22988892 *10, 2003 LEXIS 21639 *28 (E.D. Pa. 2003). *See also J. P. v. County School Board*, 516 F.3d 254, 261 (4th Cir. Va. 2008); *T.E. v. Cumberland Valley School District*, 2014 WL 47340 *4, 2014 U.S. Dist. LEXIS 1471 *11-12 (M.D. Pa. 2014); *A.S. v. Office for Dispute Resolution (Quakertown Community School District)*, 88 A.3d 256, 266 (Pa. Commw. 2014). This hearing officer found each of the witnesses who testified to be credible as to the facts despite some gaps in recollection. Any contradictions among witness accounts may be attributed to lapses in memory or differences in perspective, rather than to any intention to mislead. The weight accorded the evidence, however, was not equally placed. The persuasive value of the testimony and documentary evidence must be assessed in light of the record as a whole. *See J.P., supra,* 516 F.3d at 261; *T.E., supra*. In other words, merely because all witnesses appeared to believe what they swore to under oath does not make all of the testimony reliable or convincing with respect to the issues presented.

The testimony of the District school psychologist regarding assessment of verbal components of Student's cognitive abilities (N.T. 645-45) was particularly persuasive and was ultimately not contradicted by that of the Parent's private psychologist who conducted the May 2024 IEE (N.T. 1132-33). The IEE report was extremely comprehensive and provided a thorough

analysis of all of Student's needs as of May 2024, as well as a cogent and thorough description of how Student's needs have been met at Private School.

The Parent's two other experts, while certainly credible, lacked persuasive value in this case for different reasons. The private speech/language therapist very capably described Student's profile and appropriate responses to deficits in those areas, but her testimony was provided solely for purposes of this hearing and was through a mid-summer of 2024 lens (N.T. 1216-17, 1223), which was not directly relevant to the proposal in April 2023. The Parent's other expert who did provide a brief report was extremely self-confident in her testimony, but a significant portion of that was merely duplicative of other evidence in the record including that of the psychologist who conducted the IEE (P-38), essentially adopting all of its recommendations. She also gave an opinion on a District program about which she clearly was not sufficiently familiar (N.T. 945-46.)

The testimony of the District's sole witness, permitted over objection of the Parent, was ultimately both merely corroborative of other testimony and unnecessary to consider as determinative, as discussed below. The Parent's testimony on her intention for public school programming in the spring of 2023 was also convincing (N.T. 98-101, 116-17) and supported by other evidence in the record (N.T. 100-03) but was somewhat diminished by her expectation for urgency regarding completion of the District's ER (N.T. 200; P-3 at 1; S-1 at 4-5).

The findings of fact were made as necessary to resolve the issues; thus, not all of the testimony and exhibits were explicitly cited. Nonetheless, in reviewing the record, the testimony of all witnesses and the content of each admitted exhibit were thoroughly considered, as were the parties' closing statements.

## General IDEA Principles

The IDEA broadly mandates that each of the states provide a "free appropriate public education" (FAPE) to children who are eligible for special education services.  20 U.S.C. § 1412.  FAPE consists of both special education and related services as are necessary for the child.  20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.  Over forty years ago, in *Board of Education v. Rowley*, 458 U.S. 176 (1982), the U.S. Supreme Court addressed these statutory requirements, holding that FAPE obligations are met by providing personalized instruction and support services that are designed to permit the child to benefit educationally from the program, and also complying with the procedural obligations in the Act.

The various states, through local educational agencies (LEAs), meet the substantive obligation of providing FAPE through development and implementation of an IEP which is "'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the student's 'intellectual potential.' " *P.P. v. West Chester Area School District*, 585 F.3d 727, 729-30 (3d Cir. 2009) (citations omitted).   An IEP is developed "only after careful consideration of the child's present levels of achievement, disability, and potential for growth."   *Endrew F. v. Douglas County School District RE-1*, 500 U.S. 386, 399 (2017).   In terms of substantive content, the IEP must be responsive to the child's individual academic, functional, and developmental needs. 20 U.S.C. § 1414(d); 34 C.F.R. § 300.324.  Individualization to the child is unquestionably the central consideration for purposes of the IDEA.

An LEA is not obligated, however, to "provide 'the optimal level of services,' or incorporate every program requested by the child's parents." *Ridley School District v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012); *see also El Paso Independent School District v. Robert W.*, 898 F. Supp. 442, 449 (W.D. Tex. 1995) (quoting *Rowley, supra*, 458 U.S. at 186) (holding that an LEA "is

not required to maximize a handicapped child's potential 'commensurate with the opportunity provided to other children.'").

A child's IEP is not a guarantee but, rather, "must aim to enable the child to make progress." *Dunn v. Downingtown Area School District*, 904 F.3d 248, 255 (3d Cir. 2018).  The law mandates that a proper assessment of whether a proposed IEP meets all legal criteria must be grounded on the known information "as of the time it was made."  *D.S. v. Bayonne Board of Education*, 602 F.3d 553, 564-65 (3d Cir. 2010); *Fuhrmann v. East Hanover Board of Education*, 993 F.2d 1031, 1040 (3d Cir. 1993).  IEP development, of course, must follow and be based on an evaluation, and then be continuously monitored and updated by changes in the interim.  20 U.S.C. § 1414(d); 34 C.F.R. §§ 300.320-300.324.

## Evaluation Requirements

The IDEA explicitly provides for two purposes of any special education evaluation:  "to determine whether a child is a child with a disability" and "to determine the educational needs of such child."  20 U.S.C. §1414(a)(1)(C)(i).   Certain procedural requirements are also set forth in the statute and its implementing regulations designed to ensure that all of the child's individual needs are appropriately examined.  20 U.S.C. § 1414(b)(2); *see also* 34 C.F.R. §§ 300.303(a), 304(b).  The evaluation must assess the child "in all areas related to the suspected disability[.]"  34 C.F.R. § 304(c)(4); *see also* 20 U.S.C. § 1414(b)(3)(B).  Additionally, the evaluation must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified," and utilize "[a]ssessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the

child[.]" 34 C.F.R. §§ 304(c)(6) and (c)(7); *see also* 20 U.S.C. § 1414(b)(3).

In Pennsylvania, LEAs are required to provide a report of an evaluation within sixty calendar days of receipt of consent, excluding summers. 22 Pa Code §§ 14.123(b), 14.124(b). Upon completion of all appropriate assessments, "[a] group of qualified professionals and the parent of the child determines whether the child is a child with a disability … and the educational needs of the child[.]" 34 C.F.R. § 300.306(a)(1). If a child is eligible for special education, an IEP must be developed within thirty calendar days of an initial eligibility determination. 34 C.F.R. 300.323(c). For eligible children with an IEP who transfer from one LEA to another in the same state, the new agency must provide comparable services until the prior IEP is adopted or a new IEP developed. 20 U.S.C. § 1414(C)(i); 34 C.F.R. § 300.323(d).

## General IDEA Principles:  Least Restrictive Environment

The IDEA contains a central mandate that eligible students are to be educated in the "least restrictive environment" (LRE) that also satisfies meaningful educational benefit standards.

> To the maximum extent appropriate, children with disabilities,
> including children in public or private institutions or other care
> facilities, are educated with children who are not disabled, and
> special classes, separate schooling, or other removal of children
> with disabilities from the regular educational environment occurs
> only when the nature or severity of the disability of a child is
> such that education in regular classes with the use of
> supplementary aids and services cannot be achieved
> satisfactorily.

20 U.S.C.S. § 1412(a)(5)(A); *see also T.R. v. Kingwood Township Board of Education*, 205 F.3d 572, 578 (3d Cir. 2000); *Oberti v. Board of Education of Clementon School District*, 995 F.2d 1204, 1215 (3d Cir. 1993).

## General IDEA Principles:  Procedural FAPE

From an IDEA procedural standpoint, the child's family including his or her parents must have "a significant role in the IEP process."  *Schaffer, supra*,  546 U.S. at 53.  This fundamental concept extends to placement decisions for the child.  20 U.S.C. § 1414(e); 34 C.F.R. §§ 300.116(b), 300.501(b).  Consistent with these principles, a denial of FAPE may be found to exist if there has been a significant impediment to meaningful decision-making by parents.  20 U.S.C. § 1415(f)(3)(E); 34 C.F.R. § 300.513(a)(2); *D.S. v. Bayonne, supra,* 602 F.3d at 565.  The procedural requirements must, however, be viewed within the context of the above substantive standards.

## General IDEA Principles:  Parental Placements

Parents who believe that an LEA is not providing or offering FAPE to their child may unilaterally place him or her in a private school and thereafter seek reimbursement from the LEA.  20 U.S.C. § 1412(a)(10)(C); 34 C.F.R. § 300.148(c).  Reimbursement for tuition and related expenses is an available remedy to parents to receive public funding of the costs associated with their child's placement in a private school where it is determined that the program offered or provided by the public school did not provide FAPE, and the private placement is proper.  *Florence County School District v. Carter*, 510 U.S. 10 (1993); *School Committee of Burlington v. Department of Education*, 471 U.S. 359 (1985); *Mary Courtney T., supra*, 575 F.3d at 242.  Equitable principles are also relevant in deciding whether reimbursement for tuition is warranted.  *Forest Grove School District v. T.A.*, 557 U.S. 230 (2009); *C.H. v. Cape Henlopen School District*, 606 F.3d 59

(3d Cir. 2010); *Carter, supra*.  Those principles include compliance with the ten-day notice provision in the IDEA.  20 U.S.C. § 1412(a)(10(C)(iii).  A private placement need not satisfy all of the procedural and substantive requirements of the IDEA.  *Carter, supra*.  The standard is whether the parental placement was reasonably calculated to provide the child with educational benefit.  *Id.*  Taken together, there are three prongs to this inquiry, commonly referred to as the *Burlington-Carter* test.  There is no requirement that a child have prior provision of public special education services for purposes of this remedy.  *Forest Grove, supra,* 557 U.S. at 247.

## General IDEA Principles: LEA Obligation for Students Not Enrolled

LEAs have different obligations to students enrolled in private schools compared to students attending their schools.  Generally, an LEA has no obligation to continue to develop IEPs for students who are educated outside of the District through a unilateral placement, unless the parents make such a request.  "A parent need not affirmatively enroll their child in public school to receive an offer of a FAPE," but he or she "must either manifest an intent to enroll the child or request an evaluation." *A.B. v. Abington Sch. District*, 841 F. App'x 392, 396 (3d Cir. 2021) (citations omitted); *see also Moorestown Township Board of Directors v. S.D.*, 811 F.Supp.2d 1057 (D.N.J. 2011) (concluding that a parent's request for an evaluation by a public school prior to enrollment triggers the duty to conduct an evaluation and develop an IEP); *I.H. ex rel. D.S. v. Cumberland Valley School District*, 842 F. Supp. 2d 762, 772 (M.D. Pa. 2012) (same).  In *Shane T. v. Carbondale Area School District*, 2017 U.S. Dist. LEXIS 163683, 2017 WL 4314555 (M.D. Pa. Sep. 28, 2017), the District Court reviewed a situation where the school district had an obligation to evaluate the student unless there was a clear expression by the parent that the student would not return.  "[I[t is not the parent's obligation to clearly request an IEP or FAPE;

instead, it is the school's obligation to offer a FAPE unless the parent makes clear his or her intent to keep the student enrolled in the private school." 2017 U.S. Dist. LEXIS 163683 *41, 2017 WL 4314555 *15.  However, "it is not the secret desire of the parent that matters, but the objective manifestation of those desires that dictate whether or not the public school must offer a FAPE."  *Id*.

"Once these IDEA requirements are triggered, private school tuition reimbursement [may be] an appropriate remedy only where 'there has been a substantive harm—namely, that 'the [school district] ha[s] not made a [FAPE] available to the child in a timely manner.' " *A.B.*, 841 F. App'x at 395 (quoting *C.H. ex rel. Hayes v. Cape Henlopen School District*, 606 F.3d 59, 67 (3d Cir. 2010)).  These same principles apply equally to Section 504 claims.  *A.B.*, 841 F. App'x at 396 n.8.

## General Section 504 and ADA Principles

Section 504 of the Rehabilitation Act of 1973 prohibits discrimination on the basis of a handicap or disability.  29 U.S.C. § 794.  A person has a handicap if he or she "has a physical or mental impairment which substantially limits one or more major life activities," or has a record of such impairment or is regarded as having such impairment.  34 C.F.R. § 104.3(j)(1).  "Major life activities" include learning.  34 C.F.R. § 104.3(j)(2)(ii).

The obligation to provide FAPE has been considered to be substantively the same under Section 504 and the IDEA.  *Ridgewood v. Board of Education*, 172 F.3d 238, 253 (3d Cir. 1995).  The two statutes as well as the ADA do intersect, but as the Third Circuit recently observed, they are not the same.  *LePape v. Lower Merion School District*, 103 F.4th 966, 978 (3d Cir. 2024).  The IDEA itself notes that claims under Section 504 and the ADA are not limited by the IDEA.  20 U.S.C. § 1415(l); *see also id*.  The IDEA,

thus, places no restrictions on ADA and Section 504 claims.  *Le Pape, supra,* 103 F.4th at 979.  "The statute's administrative exhaustion requirement applies *only* to suits that 'see[k] relief ... also available under' IDEA."  *Luna Perez v. Sturgis Public Schools,* 598 U.S. 142, 147, 143 S. Ct. 859, 864, 215 L. Ed. 2d 95 (2023).  "[T]he ADA, by regulation, adds another requirement [beyond the IDEA]: the public entity must 'give *primary consideration* to the requests of [the] individual[ ] with disabilities.'"  *Id.* (quoting 28 C.F.R. § 35.160(b)(2)) (emphasis in original).  "Once he has exhausted those claims in an IDEA hearing, a plaintiff may pursue them as he otherwise would in a district court."  *Le Pape, supra,* 103 F.4th at 979.

Where a party raising claims under these statutes based on the same facts does not assert any legal distinction among them as applied to the case, the differences do not need to be separately addressed.  *B.S.M. v. Upper Darby School District,* 103 F.4th 956, 965 (3d Cir. 2024).  Thus, to the extent applicable, the IDEA, Section 504, and ADA claims based on the same set of facts may be addressed together.

## The Parents' Claims

The first claim is whether the District's IEP proposed for the 2023-24 school year was appropriate for Student.  Before turning to the program itself, it is prudent to address the Parent's contention that the District should have expedited the evaluation in light of the upcoming deadlines for Private School.  There was, however, no requirement that it do so, and a portion of the ER was minimally untimely because of the conflicts in schedules between the District and Private School staff; moreover, it was necessary for several District staff to coordinate schedules with Private School for observations and assessments at appropriate times.  In addition, to the extent that the Parent raises a procedural IDEA violation because of the timing of completion of the April 2023, that technical variance from the timelines did

not result in any substantive harm and clearly did not impede her meaningful participation in a first previously scheduled IEP meeting convened two weeks after the final ER was disseminated.

Moreover, the previous school district evaluation, in the persuasive view of the District school psychologist, was far from comprehensive, in addition to already being nearly two years old. This hearing officer accepts the District's argument that, essentially, it would have been impossible to attempt to develop an IEP that addressed even some of the Student's then-current educational needs in the spring of 2023 based solely on that evaluation and several even older reports.[9] This was, after all, not a student who enrolled in the District with a prior Pennsylvania IEP. For all of these reasons, the Parent's request for an IEP "ASAP" was, in this hearing officer's view, met through all appropriate steps under the applicable law.

Although the Parent does not seek a separate remedy for her challenge to the District's April 2023 evaluation, it does form one of the bases of her denial of FAPE claim. Careful review of the April 2023 ER reveals that this document included input of the Parent as well as current teachers at Private School. The District school psychologist conducted a classroom observation that included data on Student's on-task behavior and a description of Student' engagement. This ER did not rely on a single assessment or measure of functioning but instead included specific assessments of academic achievement, speech/language skills, and social/emotional/behavioral functioning, all of which were directly related to information shared about Student. A number of areas of strength and weakness were identified, as well as a determination Student's eligibility for special education and needs for specially designed instruction, and yielded recommendations for the IEP team across domains. The ER was also

_____

[9] As the District observes, the Parent's private psychologist did not disagree with this conclusion (N.T. 1158.) District Closing at 8 n. 5.

**Page 31 of 39**

reviewed and discussed by the IEP team. All of these elements taken together establish that the District met the criteria for an appropriate IDEA evaluation. In addition, the Parent's contention that an evaluation was not even permissible must be rejected for Student who never had an IEP in the Commonwealth of Pennsylvania, and the cases she cites to support this argument are easily factually distinguishable and clearly inapposite.

Analysis of the appropriateness of the subsequent IEP in April 2023 leads to a different conclusion, however. There are definitely many positive aspects of the proposed program, including the specific and extensive program modifications and specially designed instruction provisions, speech/language therapy as a related service, and a program placement in the public high school that satisfies least restrictive environment principles. The Parent's contention that she was denied the opportunity to participate meaningfully in the development of that IEP because the District refused her request to visit the high school during school years is not, as she argues, violative of a District policy on access to classrooms that includes specific reservations. The IEP does at least broadly address each of Student's education-related needs in the document as a whole; and a program of supplemental learning and speech/language support was obviously what Student needed. Nonetheless, and setting aside for the moment the Parent's specific objections to the appropriateness of each, a thorough review of the annual goals generally targeting many of the identified needs nevertheless reveals significant flaws that ultimately lead to the inescapable conclusion that it was not a proposal of FAPE.

Specifically, and foundationally, none of the annual goals contain baselines aligned with the goal itself, so there is no suggestion of the expectations of progress for Student to achieve over the one-year period. As such, without the requisite criteria for mastery or progress monitoring, the goals in this IEP are simply not measurable, nor are they descriptive

**Page 32 of 39**

enough so as to be clearly understood.  This was not a circumstance where Student was unavailable for additional assessments or Student and the Parent refused any testing.  Even with all of the modifications and specially designed instruction intended to support student across classes, it was not possible from a review of the April 2023 for the Parent, or even the hearing officer, to understand how the District would be able to assess the program as it was provided and to respond as necessary should Student not demonstrate success with the program.  Although the expectation that new baselines would be established at the start of the school year to better reflect an accurate starting point for the goal was realistic from an LEA perspective, here the IEP lacks any information on current performance and functioning that would permit any confidence in the goals as written. This major flaw in each of the April 2023 IEP goals is necessarily fatal in this case.  In addition, there is no goal for reading fluency or self-advocacy and self-confidence, all of which were known weaknesses at the time and were required to be part of that proposed IEP.

The remaining portion of the first issue relates to the May 2024 IEP. Here, the same result simply cannot be reached because, as a parentally-placed private school student, the District was under no obligation to Student to propose a program for the 2024-25 school year unless and until the Parent asked for an evaluation or offer of FAPE.  She did neither. Although the Parent posits that this case must be treated differently similar to than the student in *Moorestown, supra,* 811 F.Supp.2d at 1069 ("residency, rather than enrollment, triggers a district's FAPE obligations,"), other binding precedent confirms that such a requirement flows rather from a Parent's request for "obtaining a new IEP." *A.B., supra,* 841 F. App'x at 396.  Nor can this hearing officer agree that the pleading requirements in the Administrative Procedures Act, 1 Pa. Code §§ 35.1 *et seq.,* override those specific to the express requirements for filing a Complaint and Answer

**Page 33 of 39**

such that waiver or default should be found.  As she did before, she refers to her previous statement that this type of hearing is "deliberately informal," *Schaffer, supra,* at 61, and accordingly formal procedural rules do not apply here (HO-2 at 2; HO-5 at 2).  Further, the Parent's description of her active participation at the May 2024 IEP meeting (N.T. 131-32) does not comport with the more persuasive account by a District professional (N.T. 373) that was further corroborated by all of the other evidence of the wholly different approach she took in the winter and spring of 2023.[10]

Furthermore, the additional Parent's contention here mirrors that rejected in *Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259, 274 (3d Cir. 2007) ("although dual enrollment is permissible under section 502 of the Pennsylvania Public School Code of 1949, *as amended,* 24 Pa. Stat. Ann. § 5–502 (West 1992), there is no evidence of which we are aware that Lauren continued her enrollment in District schools after beginning at Hill Top.") This hearing officer is unaware of any authority for the proposition that if a parent fails to formally disenroll a child from an LEA, that enrollment continues indefinitely even without a specific request for an evaluation or offer of FAPE, and she declines to accept that position in light of all of the law to the contrary.

In this case, despite understanding the process for seeking a public school program and placement experienced during the 2023-24 school year, the Parent waited until February 2024 to contact the District.  That contact did not even hint at an evaluation or offer of a program, as she had the prior school year, but instead merely demanded funding for Private School for the 2024-25 school year.  She quickly thereafter signed an enrollment contract

---

[10] The Parent's reference in her closing statement to her willingness to forgo a deposit for Private School was a response to a question about 2023, not 2024 (Parent Closing at 24 n. 124).

**Page 34 of 39**

with Private School and paid a deposit following the District's denial of that demand.

The Parent's unquestionable objective manifestation to the District in the spring of 2024 did not trigger any obligation on its part to Student under the applicable law. Although the Parent has correctly pointed to the compliance with the notice requirement in the IDEA for seeking reimbursement, there must first be a responsibility to develop a program. As discussed, the Parent's contention that Student was never disenrolled from the District so there was always an obligation for it to develop programs is not substantiated by the record and cannot overcome this hurdle. Her voluntarily providing a report card cannot reasonably be interpreted as sharing appropriate educational information, and her execution of a release on the same date that she signed the enrollment contract for the 2024-25 school year cannot transform her objective disinterest in a District program into a legal obligation on its part.

Even assuming, *arguendo*, that the District attempted to undertake such an obligation by convening the May 2024 IEP meeting, the case law is clear that the IEP must be evaluated based on the District's knowledge at the time. The Parent presented no evidence on what records the District sought pursuant to the release, nor any response by Private School. Assuming that it had sought records after the Parent's execution of the release, the most recent document in the Student's file would have reflected enrollment and payment of a deposit by the Parent for the 2024-25 school year. Even if the District had access to all records as of March 20, 2024, the timing of the May 2024 IEP meeting did not permit a sufficient opportunity to obtain relevant records, seek any necessary clarification, fully consider all information available to it, and draft an IEP for proper team discussion and consideration. After all, the IDEA timelines for an evaluation and development of an IEP are deliberately of sufficient duration for important

reasons, including an LEA's ability to respond appropriately through an IEP reasonably calculated to address all needs for a student who had not been in public school for years and undoubtedly would not attend in the fall of 2024. Simply put, the District was not in a position, through no fault of its own, to fully determine and consider Student's needs and respond appropriately thereto in light of the Parent's already made decision at the time of the May 2024 meeting. The Parent's lack of effort to work with the District in the spring of 2024 including at the actual meeting underscore the reasonableness of the District's own efforts.

Because the program proposed for the 2023-24 school year was not appropriate for Student, the appropriateness of Private School must be addressed. Private School serves children with educational needs like those of Student through a program that focuses on those skills throughout the school day. Student has classes across domains consistent with those offered by public schools. Class sizes are small and permit more individualized instruction and support than would a larger class, something reportedly very beneficial for Student. Student has acquired necessary reading and written expression skills, made gains with executive functioning, and earned very good grades with positive reports from teachers. The testimony of the private psychologist who conducted the IEE is wholly credited for this step. This hearing officer concludes that Private School was appropriate for Student for purposes of this prong of the test.

The last issue relates to the third and final consideration in a tuition reimbursement analysis, the equities. For the 2023-24 school year, which is the applicable time period, the Parent contacted the District and asked for a program and placement. She cannot be faulted for being unfamiliar with special education legal requirements and processes, and it is understandable that she would want that offer as soon as possible. Her testimony that she remained interested in public school for Student for the 2023-24 school year

was convincing, and was corroborated by her objective manifestations in the spring of 2023 by participating meaningfully in the ER and IEP process. There are simply no equitable reasons against either party.

In conclusion, the Parent has established by a preponderance of the evidence that she is entitled to reimbursement for tuition and related expenses for Student at Private School for the 2023-24 school year, but not to any further relief.

Finally, the Parent does not raise any claims under Section 504 or the ADA that require separate consideration and analysis.  To the extent that she has been required to exhaust all administrative remedies, she has done so.

# **CONCLUSIONS OF LAW**

1. The District's proposed program for the 2023-24 school year was not appropriate for Student.

2. The District had no obligation to propose a program for Student for the 2024-25 school year.

3. Private School is appropriate for Student.

4. The Parent is entitled to reimbursement for tuition and related expenses incurred for the 2023-24 school year.

# <u>ORDER</u>

AND NOW, this 31st day of August, 2024, in accordance with the foregoing findings of fact and conclusions of law, it is hereby **ORDERED** as follows.

1. The District's April 2023 proposed IEP did not offer FAPE to Student based on the information known to the District at the time.

2. The District had no obligation to propose a program for Student for the 2024-25 school year, and its May 2024 proposed IEP was without legal effect.

3. The Parent is entitled to reimbursement for tuition and related expenses actually paid by her for Private School for the 2023-24 school year.

4. Within fifteen calendar days of the date of this decision and order, the Parents shall provide documentation to the District of all existing receipts for tuition actually paid, and any related expenses, for Student to attend Private School for the 2023-24 school year and were paid by the Parent by the end of that school year.

5. Within thirty calendar days of receipt of the above documentation, the District shall reimburse the Parents for

**Page 38 of 39**

the full amount pursuant to this order.  The District is not ordered to provide any reimbursement in excess of any actual amount paid by the Parent by the end of the 2023-24 school year.

6. Nothing in this Order should be read to prevent the parties from mutually agreeing to alter any of its terms in writing.

It is **FURTHER ORDERED** that any claims not specifically addressed by this decision and order are DENIED and DISMISSED.  Jurisdiction is RELINQUISHED.

/s/ Cathy A. Skidmore

_____
Cathy A. Skidmore, Esquire
HEARING OFFICER
ODR File No. 29513-23-24